The first case is Bellin v. Zucker. We have the attorneys here. Yes, Your Honor. Thank you. Appellant, may begin. May it please the Court. For over 50 years since the founding of the Medicaid program, persons who applied for Medicaid services who were not satisfied with the initial determination as to amount of services to which they were entitled had the right to appeal those initial determinations. For over 25 years, this Court has held that if a state outsources those initial determinations to private entities, those appeal rights still apply. Nevertheless, the District Court in this case ruled that because New York had outsourced its initial determinations as to the number of to private entities known as MLTCs, the persons applying had no such appeal rights. In this case, the state did more than just outsource the single determination. It changed the structure by statute to allow customers, potential benefit recipients, to choose among different MLTCs. There is no established relationship with any MLTC until one enrolls. Much seems to depend upon the enrollment choice that is made. Conceivably, based on your position, an individual who is deserving of benefits could challenge initial determinations with five different MLTCs for different levels of benefits. I think that your position is inconsistent with the new statutory scheme. What am I missing? Well, Your Honor, that actually isn't our position. Our position is, first of all, as an initial matter, our position is that in this case, Ms. Bellin actually enrolled with an MLTC. After she enrolled with the MLTC in this case, which was RiverSpring, she had the right under the new regulations and statute to appeal the pre-enrollment determination of that MLTC. Why is that? Why did she get that? She was made an offer. She made three offers with regard to varying types of services by three different organizations, and she accepted one, correct? That's correct. So, it's not that she requested services of them. They told her what they thought she needed, and she accepted one. So, she was getting services that were offered. She had requested services different from what was offered, had she? Yes, she had, Your Honor. The nurse came in and evaluated her from RiverSpring, and the nurse said, we're going to say you are entitled to only eight hours. Ms. Bellin said, no, I need more hours than that. Okay, so I understand that she said she needed more, but RiverSpring offered eight hours, and she accepted them. Well, Your Honor, she had no three offers. There were three offers from different entities. Did they differ in kind? I don't believe, not significantly, Your Honor. Do we know for the record if they differed in kind? No, we don't. It's not in the record, Your Honor. Well, so you could have a situation where they did differ in kind, couldn't you? You could. Well, one offered six, one offered eight, one offered 12. Now, what if Ms. Bellin had accepted six and then said that she really wanted 12, and wanted to immediately appeal the fact that the group that she'd accepted had only offered six, and she wanted 12? That group was closer to home, they had nicer people, she had other reasons for accepting that. Will we be getting into competing offers, and somehow providers will end up being played against each other like that? Well, first of all, that's not what happened here, Your Honor. I understand that, but you're asking for a remedy that's going to be applied across the State Council. You're not asking for us to fix your case. You're asking us to apply a legal standard and impose a legal obligation within an incredibly complexly regulated statutory scheme, and you don't tinker with the statutes in order to understand what the implications are across the board. Right. Our position is, Your Honor, that after you enroll and choose an entity, you're allowed to appeal just that entity, and that's exactly what happened here. Under the regulations, it says that once you become an enrollee, you have the right to appeal an adverse benefit determination. An adverse benefit determination, Your Honor, is defined simply as a determination about the number of hours or the amount of benefits to which you're entitled. I'll read to you. It's a denial or requested service. Was this a requested service or was it an offered service? It was absolutely a requested service. The only entity to which you can request the service for personal care hours, Your Honor, is the MLTC. There is no other entity. They're the ones that make that determination. I'm sorry? I understand that. I agree with you with that. They're the ones that make that determination. There's no other person to which to make the request for a number of hours. When you file the Medicaid application for eligibility, you don't request the number of hours. It's only made to the MLTC. They're the only ones by statute and regulation that are entitled to make that determination, and once they make that determination, you have a choice. In this case, Ms. Bellin tried to appeal that determination before she enrolled and was told she couldn't appeal it because she hadn't enrolled. Then she enrolled, and she tried to appeal it again, and she was told, No, you can't appeal it because of pre-enrollment determination. This is a system set up by the state, which is very unusual. The regular way managed care is set up, Your Honors, is that you first get accepted to a managed care organization, and then you first apply for benefits. At that point, you're an enrollee, and you get to appeal. New York has set up this backward situation where first you have to apply for a particular type of benefits, and only then do you enroll in the MLTC. This is a backward situation, which the Congress and the regulations didn't conceive of. It's not even clear that it's legal, but assuming that it is, New York can't make that situation. I agree with you that it seems odd in some ways, but it's been approved by CMS, hasn't it? It's been approved by the Secretary. No, it has not been approved, Your Honor. CMS never approved this particular angle of the plan. CMS has not approved it. It's just the way this is working, Mr. Bellin. I'm not trying to be difficult with you. Let me ask you, what's the relief you want? Do we have to start tinkering with all the regulations? Is that what we have to do? You do not, Your Honor. The relief that we're requesting is that after someone enrolls in an MLTC, they have the right to appeal the determination made by that MLTC, the initial determination. What process would that be? Would that be the existing in terms of timelines, et cetera? Your Honor, our position is that once a person enrolls in the MLTC, that's when the notice is required to be given by the MLTC of the right to appeal under the regulations. On the day of enrollment? On the day of enrollment. That's correct, Your Honor. How do they know they're adverse at that moment in time on the day of enrollment? I suppose the applicant has to signify that they're enrolling, but they're not accepting of what they're getting? Correct. That's the way it worked under the service program beforehand, Your Honor. You'd accept the number of hours that they gave, and then you'd appeal it saying that they weren't sufficient. Otherwise, people would be left in a terrible situation, Your Honor, where they would say, I need 18 hours day of care. They're only offering me six. I'm going to take nothing, and I'm going to appeal. Are there any factual issues yet to be resolved? Your complaint was dismissed, but it seems to me there's a lot that is uncertain about how this operates in practice. For example, how the uniform assessment system channels discretion and so on, and particularly with regard to people, unlike Ms. Bellin, who don't require full-time care seven days a week. There's a lot of variability and uncertainty, in my view, about what kind of entitlement there might really be, but it's difficult to tell from the, you know, this is just a complaint about how the system actually operates. Could you identify any particular factual questions? I mean, assuming, if we were to agree with you that the complaint was adequate, what kind of things would a summary judgment proceeding bring to light that might determine the answer to the question of just giving Judge Wesley about what kind of relief is appropriate? I see that my time has run out. If I can answer that question. Of course you can answer the question. The answer is, Your Honor, that as to the due process argument, we totally agree that there are more factual questions, that we need discovery. We believe that we've made a plausible argument that the discretion is very limited by New York rules and the criteria, and we would like to have discovery on that very issue, on the fair hearings, on exactly how the state makes these determinations or demands that these determinations be made. So certainly on the due process claim, there is more, there is more to be, there's more discovery, there's discovery that is necessary. On a statutory claim, we believe that we're correct on that statutory regulatory claim, but obviously we'd need discovery to prove the facts that substantiate that. Thank you. Wouldn't a plaintiff who never got the hours they asked for, unlike Ms. Bellin, be a better plaintiff in this putative class action than Ms. Bellin, who has gotten what she asked for? Well, Your Honor, what she didn't get is, she didn't get to appeal the initial determination. That's never appealable. She's gotten what she asked for on a going forward basis, but under the inherently transitory exception to the mootness rule, which applies directly to this case, there's going to be no plaintiff who's going to be able to satisfy the regular mootness rules. And that's because if you're denied the number of hours you and then you become a member of the plan, and then you apply for a new determination, that determination should be made within 14 to 28 days, not enough time for... This lawsuit is all about that period of time when she didn't get what she asked for, even though she ultimately was successful. That's correct, Your Honor. The fact that she's successful does not moot this out. As this court's inherently transitory cases say, that's what they specifically talk about. There would be no period of time, there would be not sufficient amount of time for anyone to bring a case in federal court. We brought this case in 2019, and the matter was... And she got the ongoing care for 24 hours a couple of months after we filed this case. So there really is going to be no other better plaintiff than Ms. Bellin. Let me ask you this. I want to see how... You've answered a couple of questions differently. I don't mean inconsistently, but just in your answers, let me be concerned here a bit. Are you saying... Is your claim that she's entitled to a hearing before she enrolls or only after she enrolls? Our initial... Our first line is, Your Honor, she's entitled to it after she enrolls. You don't need to reach the issue of whether she's entitled to it before she enrolls. If this court were to enroll, it is pretty nascent. I mean, it's... She hasn't accepted, she hasn't been entitled to anything. She's got an offer, but she... And she may be entitled to some things, but until she's an enrollee, she doesn't fit within even the regulatory framework, does she? She does not. For the second... For the regulation under the managed care statute, that's correct. That's why we're saying she did enroll and they did let her appeal. All right, Mr. Bellin, finally, with the indulgence of the presiding. A person who enrolls, a person who wants 12 hours a day, but is offered eight. A person who's been in managed care and gets eight hours a day and has been in managed care for a year. So one's been an enrollee for a year, one is about to become an enrollee. They both... One's offered eight, one's got eight. They both want 12. On the day that the person who's an enrollee asks for 12 and doesn't get it, she has an adverse determination, and she has a hearing process that can take up to 60 days, correct? That's correct. All right, now the person who enrolls and on day one says, I don't like the eight, I want the 12. How is she any different than the lady I just mentioned, the person I just mentioned? Well, because first of all, it takes time to enroll. You don't just enroll the day after you sign up. They make you enroll on the first of the next month. Why? No, wait a second. So stop. Are you asking us to shorten the enrollment period to... No, I'm not. What I'm saying is... Inherent within the enrollment is a difference, a lag of time. So you can't... Your injury of lag of time can't be the result of the enrollment because you forswore that. So what's the next difference? The injury is that if you can't appeal after you... It's that the state says you can't appeal after you enroll. That's the difference. You have to wait till they make initial determination. It takes time for them make an initial determination. Okay. On day one, she says, I accepted the eight, but I want the 12. On day one, she says, I want that. That's no different than what the person who's been in the system for a year and does the same thing. Don't they... Aren't they treated exactly the same in terms of when they can appeal, when they get their notice of a denial, absent the time that it takes to become an enrollee? Aren't they treated exactly the same? No, Your Honor, because if someone is already in the managed long-term care plan, and the equivalent would be someone in a managed long-term care plan who's applying for the first time. They're in the plan. They're applying for the first time for care. The initial determination is made. They get to appeal that immediately. The difference is that for the person who wasn't an enrollee before, an initial determination was made. Then they join. Then they have to ask for a deferral. That's the difference. There's a delay. This court has held for over 40 years that a delay of getting Medicaid benefits is irreparable harm. If I could follow up. Does one have the right to reimbursement and the other not for services privately procured during that period that Judge Wesley is focusing on? No, they both. If they're once they're in the MLTC, they have the right to reimburse. Our position is they have the right to reimbursement before that as well, because there's a retroactive period. But you're never going to be able to appeal that initial determination and determine whether you're entitled to reimbursement under this scenario where you have to apply again once you become an enrollee, because the state says you can never... Isn't that because the first offer is part of the sales techniques of these various plans? They make an offer to try and get people to take their offers. Your Honor, it's not part of the sales techniques. This is a capitated system. The entities get a specific amount of money per month for each person. As the MHTA pointed out, people who have more than eight or nine hours of care needs every day are money losers for these MLTCs. There's no competition for these people. People who need a lot of hours are considered, I don't want to say the dregs, that's the wrong word, but they're not wanted by these entities. They lose money on them. So the competition is money loser. By the way, going to different entities is not the same thing as getting an independent ALJ to make a determination. The entities have their financial incentives that make them give fewer hours. The ALJ does not. So to be clear, your injury then, you say, is that with regard to the enrollee, is that the enrollee who asks for more than what was offered... And I'm not ascribing a value to that. Please understand that. The enrollee who's unhappy with what they've accepted has to be re-evaluated, whereas the person who's already... But isn't the person who's already been in for a year and asked for more hours, don't they have to be re-evaluated to see if they're entitled to more? That's only a situation, Your Honor, where the person already has hours. We are people in MLTCs who are not getting personal care services. They make their initial request for services. The initial determination is made. They get to appeal that immediately. That's not the case for the people who are not already enrollees. They get initial determination before enrollment. Then they enroll. Then they're told, oh, you can't appeal the initial determination because it was pre-enrollment. You've got to ask for another initial determination. You ask for another initial determination. Thirty days or so goes by, and they make a determination, and only then can you appeal. So there's a significant amount of time that you're not getting the care that you may be entitled to. Well, that happens for an enrollee who has... So it doesn't because the enrollee, right after the first decision is made as to how many hours the enrollee is entitled to, they get to appeal immediately. For a non-enrollee, that determination is made before enrollment because of the way the system that New York has set up. Lastly, and then I apologize, Chief. We've gone a long way. Your statutory hook for your right for this relief, is that in the... You're hanging your hat pretty much on what is an adverse benefit determination? Yes, that is under the 438 regulations. If the 438 regulations don't cover it, then we go to the 431 regulations under 1396A3 that preexisted and were not... I'm sorry. No, okay. Thank you very much. Thank you. Let's turn to Dr. Zucker, the FLE. Thank you, counsel. Good morning. May it please the court, Caroline Olson on behalf of the state FLE. The district court's decision should be affirmed because the case is moot and because Ms. Bellin has failed to state a claim with respect to the adequacy of appeal rights afforded to Medicaid beneficiaries seeking personal care services through the state's market-based managed long-term care enrollment system. But you heard counsel say there really isn't a market because Ms. Bellin was going to be a loser and a lot of people were not going to clamor to get her as an enrollee. Is that correct? It's not, Your Honor. There are four different considerations that explain why this is a competitive market system. The first is each of these plans is competing for a payment. If they don't enroll someone, they don't get paid and so they have an incentive to enroll someone. The enrollment capitation payment is then tailored to the characteristics and needs of the population served by that plan. And so, for plans that tend to cater to individuals with higher needs, they get a higher capital payment payment. It's also important to remember that many of these plans are nonprofits and so profit isn't their bottom line. In fact, these are committed to serving their communities and have every incentive to provide the full amount of care. The other point I'd make is that the financial pressures that Ms. Bellin ascribes to manage long-term care plans apply equally under the fee-for-service model because it was the local social services districts that were also making determinations about personal care services and those determinations were coming out of what it was a finite pool of money and so they were under the same financial pressures that Ms. Bellin ascribes to the plans. So even though, counsel, there weren't other offers in the record were informed, you believe there could have been and would have been other offers for this person? That's right. Although the record doesn't contain information about what the level of the other offers was, what we do know is that Ms. Bellin was received at least two other offers and that's the way the system is designed to work. In fact, someone in Ms. Bellin's position is able to apply to over 20 different managed long-term care plans and to obtain offers from all of them. I think that's sort of the crux of the problem here because although Ms. Bellin is now trying to limit her argument to what she ascribes as the ability to appeal on day one, she's never been able to articulate a limiting principle to her argument which means that realistically her argument extends the proposition that anyone who gets a pre-enrollment offer at a period when they are still free to shop around to as many as 20 other different plans, they get an immediate appeal right. That has the consequence both of overburdening the state's fair hearing system and detracting from the amount of services that a plan is ultimately able to dedicate to enrollees. Presume that she doesn't persevere on that argument, but what about the fact, what about when she accepts the offer and but it's still inadequate in her mind or in her family's mind. These judgments, you know, how many hours do you need a home health aide, what kind of assistance is needed with toileting, how well does she manage cooking for herself, cleaning her apartment, doing other things. These are not like whether she has a herniated disc at C4 or C5 where you can look at, you know, these are to some degree judgment calls which calls into question the whole property interest to some degree, but they're judgment calls and there's not exact science to this. And so why is it once after she's enrolled that she can't express her dissatisfaction with what she's got and why doesn't she have an entitlement to be treated equally to the person who's been on the plan for a year. Your opponent says she's treated differently, in your brief you say that she's not. This is what I'm pressing for. Is she treated the same as a person she on day one after she's accepted the offer, she said this wasn't enough but I had to do something. I'll take eight hours for now but I really need 12 or I want 24. And your opponent says well that's not treated as an adverse determination. She has to reapply for an increase in hours. Does she have to do that? On day one she must make a request for an increase in service. So then there's re-evaluation? There's a de novo review conducted that is a request that then on day one what she finally has is a request for service that triggers a 14-day period in which the managed long-term care plan must make a decision that if it decides not to provide the services that's an adverse benefit determination she can appeal within the internal appeal process and within the state fair hearing process. And remember during that time she is getting some level of services that were provided during the interim period. I'm just trying to work through the law side of this not the policy side of this thing or the politics side of the appeal side of this thing. So now it's me and I have a home health aide for eight hours a day but I've been enrolled in the plan as our new enrollee. And I've been in for a year and on day 366 I say you know it just hasn't been working out. There's just not enough being done around the house. I need more time. My daughter thinks I need more time. My physical therapist thinks I need some help with some other things. And I say I need more home health aide time. Do I have to show a change in condition or can I simply request more services? So on that day you are similarly situated to the person who has just enrolled. You have to make a request for service. Presumably there will need to be some showing in a change of condition although not necessarily. What needs to be established is the current level of services is not adequate. So that may be because of a change in condition or maybe because of a determination that the existing services that you've been getting were simply inadequate to your needs. But once you've shown that what you're getting now is inadequate you are identical to the person who enrolls on day one because you make a request and that triggers the 14-day review period by the managed long-term care plan that then triggers all of the subsequent appeal rights. And something else I should note here is that there are plenty of built-in here that are built into the system that are intended to basically fulfill the same purposes of the state fair hearing process that Ms. Bellin wants. There are expedited procedures within the system so if you feel like a 14-day review period or a 13-day appeal period are not fast enough you can obtain a doctor's provision to get an expedited determination within 72 hours. You can get likewise an internal appeal within 72 hours. So there are protections baked into this system to ensure that individuals are getting the care they need while they go through the appeal process. If during the appeal process I procure the additional care that I think I need, I engage someone to spend the night and to be with me 24 hours a day, am I entitled if I prevail ultimately to be reimbursed for whatever I paid for those services in the date of enrollment. You can get back payment date to the date of the period in which you were entitled to receive services. And it depends a little bit on what the actual determination of the state fair hearing process and what the judge actually determines was appropriate. But there are situations in which compensation was available. And in this case, for example, there was a state fair hearing determination that provided some retroactive authorization of services. Mr. Dillon says that the reason why there's a problem with the way the New York system works is that it's an outlier or that it's different from other models and that the normal model is is that you're joining a provider and then so you're enrolled and then home health services come off of that. There's not this bidding process that goes on. Whereas in New York, you're forced clear of their hurdle through it's an interesting name for the company, Maximus, and the independent third party provider that I guess evaluates if you're eligible from an income standpoint, et cetera, et cetera. And then you kind of go on to the marketplace. And he says that's why there's a problem in the word enrollee, because normally you're already enrollee before you get into the situation where you're asking for home health care aid. And so that's why adverse determination is a simple thing in that model and why it gets kind of why it kind of gets separated out and creates a problem here. What's your view of that? So I don't know the specific details of every other state plan. I'll say a couple of things. The Medicare Medicaid statute is designed to give states maximum flexibility. And so there are a lot of different systems that can comply with legal requirements. And the question is not whether for our purposes is simply whether the state system complies with federal Medicaid law. And it does. Now, the New York state has been a leader in both managed care and personal care services. Personal care services are not required to be provided. It's something that the state has elected to do and does so in a very protective way. Now, the parts of the system that Ms. Bellin, I think, is concerned about this disaggregation of the eligibility and number of hours determination actually has a lot of protective benefits for individuals. What you have by allowing the Maximus or CFAC to make the initial eligibility determination is that you have an entity with absolutely no financial stake in the question making the determination as to whether you are eligible for personal care systems. That's different from what as I explained from before, from the previous system, where it was a local social services district that was also on the hook for specific numbers of dollars and the amount making that determination. Now that determination is separate. Then you have the competition angle, which gives rights to potential enrollees that are also absent from the different system, which is this right to ask for up to 20 different offers if you're a New York City resident for multiple different plans. And there's a consumer choice involved that you can continue soliciting offers right up until the day enrollment and then after if you are dissatisfied with the number of hours that you receive. Again, that's different from what happens in, for example, mainstream managed care or other managed care programs in other states. In that instance, you're already enrolled with a plan. There isn't this option to shop around. Part of what that is creating is you have the eligibility determination for Medicaid, you have the qualification by Maximus, that decision, then you have the transfer to the enrollment broker and the shopping around for the plan you want to enroll with. And then you have various offers made you and then a choice. So the system, while engendering competition, also creates a gap during which the consumer is not receiving the services potentially needed. And that's part of what the concern is. The state has already acknowledged through the Maximus determination, through its own Medicaid determination, that the person has an entitlement exactly to what we don't know. Maybe in the 24-hour circumstance, it's really very clear. But for other people, it could be eight hours, six hours, you know, very tailored or what have you. So there's some kind of entitlement that's gap while you shop around and you help the state reduce costs by, you know, participating in the competitive bidding system. But that's what, to me, is part of the problem is here. That you then have no ability to get what you really need until potentially 28 days after you make an enrollment choice. And so there's this 28-day period and then the gap between the qualification and actually enrolling that leaves people who are potentially in great, great need with no way to get the services they need. So how can you address that concern? Because, I mean, that creates legal rights also in our kind of due process, you know, under our analysis. Just to add to Judge Carney's question, retroactive damages won't help a person who doesn't get the care they need. Go ahead. Absolutely, Your Honor. So to address the gap question first, all of these are time-limited determinations. Well, I'll take a second. All of these are time-limited determinations that ensure that the process moves quickly. And I should also note that the same way that there are expedited procedures in place to expedite the internal appeal and appeals processes within managed long-term care plans post-enrollment to expedite that process into a period of basically six days, there are also under the New York State regulations under Section 505.14, procedures in which you can actually get Medicaid enrollment determinations and personal care services within 12 days. That's not something that Ms. Bellin applied for, but if there were an urgent medical need, you obtain a doctor's note and you make an attestation. And those are available if there was a situation where someone's health was seriously at risk and they did not have voluntary care available to them. So there are procedures in place to make sure that during this delay, individuals are getting the procedures that you need. There's also a question, I think part of the question also goes to a due process question, which is this question of entitlement. And that gets to this disaggregation point that we were talking about before, which is that the question of eligibility for personal care services, that's something that is immediately appealable to the state fearing here process. But the issue in the right that Ms. Bellin is categorically different. It's about the difference between six hours or eight hours or seven hours. And that is a medical judgment that is layered with a bunch of discretionary and judgment-laden determinations. That is not the kind of right that is protected property interest of which this court is recognized. But excuse me just a sec, but on that particular point, I had the impression, though it's hard to tell at this stage of the proceedings, that actually the uniform assessment system channels and limits the discretion that different players in the assessment hierarchy get to apply. And that actually there may be less discretion than one would seem coming at it fresh and determining whether it's a six-hour slot or an eight-hour slot or 24 hours and a day, seven days a week. Is that something that you can speak to? I disagree with that characterization. And I would just note on that point that I think when you asked my colleague if he could point to any particular facts that would be developed in the fact he might point to just saying that there are things that we'd like to discover. And I think that's telling what the uniform assessment system does is direct the managed long-term care plans to make to consider certain factors. And so it says mandatory considerations, but those considerations themselves require the exercise of discretion. And so while it, for example, mandates that you consider a doctor's order, that doctor's order that talks about the condition of a patient is entirely a question of medical judgment. Likewise, the social assessment requires you have to consider the patient's, you know, views about their own care, but then requires a nurse, for example, to assess the motivations of the voluntary caregivers. And so while there are mandatory considerations, the assessment of those considerations and balancing of them are discretionary enough that they do not give rise to a particular property interest, particularly when you couple that with the fact that there is no conclusive determination or concrete determination of rights. These are pre-enrollment offers, so it's not the kind of deprivation that would occur, for example, when you make a determination that someone is categorically ineligible for personal care services. I see that my- I, if I may, Judge Pooler. So in Barrows and Burwell, we found that it was improper to dismiss, to grant a motion to dismiss in a case involving similar kinds of rights of Medicare beneficiaries in that case about how actually observation status versus admission status in hospitals worked. And that the nature of property interest, the nature of the, you know, how the administrative system worked to deprive people of their state-acknowledged rights was uncertain enough on the motion to dismiss in light of the presumptions that we're supposed to give to plaintiffs that further factual development was necessary in order to determine whether those rights had been infringed on. Why is this case different from how Barrows and Burwell went? A couple of factors. The first is that in Barrows, I think this court was very clear that had the decisions about whether to admit versus keep observational care, had that been a purely medical judgment, there's no question that there would have been a property interest. The problem was in that case, there were specific allegations in the complaint that, in fact, the decisions about admitting versus observational status were now being done by sort of standardized and mechanical tools. There is no similar allegation in the complaint. And in fact, when that case went back on remand, there was a distinction between judgments at the medical determination and doctor admittance level and then independent review boards that used standards. While the decision that required substantial medical judgment was not a protected property interest, when you were applying very specific and concrete standards at the review level, that was something that was determined to be a property interest. And I think we're on the line of medical judgment, particularly since that was also a categorical, you know, you had a binary choice, admittance or observational status. Here you have an array of anywhere between zero and 24 hours with all sorts of considerations like cost effectiveness, whether or not there are voluntary caregivers, whether or not an individual who otherwise would get 24-7 care has space in their home to have someone live with them. And they're so even when you would otherwise think that perhaps someone is entitled to a very extended period of care. There are other considerations at play that just cut against any concrete entitlement to a specific number of hours. And I know I'm very over time. If I could just have a question. You have these 40 minutes of argument that we've just had. Do you still believe the issue is moot? Thank you, Your Honor. That's exactly where I was. I was going to go. And the answer is yes. Miss Bellin's individual claim was mooted out for a reason that was unique to her. Her condition changed. And the inherently transitory exception for class action claims simply does not apply. The alleged injury here is that the absence of a pre-enrollment appeal rights and that absence will not change for any class member. And there's absolutely no evidence or allegation in the complaint that other class members are going to experience a similar change in condition parallel to Miss Bellin that will result in the full provision of services and deprive them of an interest. And because there will always be a class of individuals who have surviving claims that a court can determine before class certification, this is not a case where the inherently transitory exception to mootness applies. Thank you. We'll hear from ElderServe Health or RiverSpring. I think it's the same entity. And that person, Mr. McGovern, is arguing by telephone. Mr. McGovern, yes. Yes, Your Honor. Thank you. I apologize as well for not being able to join through Zoom. I was unable to connect. So I'm dialing in. RiverSpring is a not-for-profit Medicaid-managed long-term care plan and is one of roughly 20 plans serving enrollees in New York City and in Nassau, Suffolk, and Westchester counties. And RiverSpring is named in the suit because the appellant accepted its offer of appropriate care hours and chose to enroll in its plan. So RiverSpring concurs and won't repeat the points and arguments made by my colleague, Ms. Olson. I want to just briefly, though, address a few of the points made, some of which are gratuitous allegations against managed long-term care plans in the appellant's reply brief and in the MECI brief, and just to offer the perspective of the managed long-term care plan. And I think my colleague has already addressed and Your Honors alluded to the unworkability of providing affording appeal and hearing rights to any and all potential enrollees given the requisite 14-day notice of appeal rights and how that would just be a system that would not work if all and any potential enrollees would have to be given those requisite notices. Agreed. The plans do get a monthly capitation payment, but that is adjusted for the risk of its members. And so that the higher the care needs and associated hours, the greater the adjustment to the premium relative to the peers in its region. And really, they do have an incentive to offer enough hours to satisfy the potential enrollee because that enrollee can then otherwise seek more hours or greater level of services from any of the other 20 plans that serve the New York metropolitan region. And I want to add one point, and it's been alluded to. There really is, this concerns the process claim. There is no realistic expectation that any potential enrollee will be offered 24 hours of personal care or any other level of services because that plan's initial assessment of the beneficiary's care needs and medically necessary hours involves an individualized assessment. And so if I can interrupt. Yes, Your Honor. The amici cite multiple examples of clients who have faced hardship trying to obtain personal care services. Is this a sign that the MLTC system is not functioning properly? Yeah. Your Honor, so those allegations I don't believe concern the specific claims, statutory and regulatory as well as due process claims in this case. And obviously, certainly make the, try to make the case more sympathetic to the appellant here. But no, there is no issue. I would submit, Your Honors, that in fact, the system as it is now is really consumer driven. It's really designed to give the potential enrollee the, really to make the decision whether they accept a particular plan or not. So there's every incentive for plans to accommodate the needs of beneficiaries and notwithstanding the gratuitous allegations in some of the amici brief. So the system itself is structured so that it is really oriented toward the consumer, i.e. the potential enrollee. And so yes, and the ALJ decisions, which in many cases do rule in favor of the appellant, is I think testament to the robust nature of the existing system that gives enrollees the opportunity to appeal and go to hearing once they become an enrollee and request a change in services and are denied. So I do believe that the, contrary to the suggestion by Amikai, that the system actually works to protect and afford options and choice among consumers, including prospective enrollees. Yes. Could I interrupt? This is Judge Carney. Could you take a minute to just describe how the uniform assessment system works with regard to your client's evaluation and offers made of services? I had the impression that it may work to channel your client's discretion seriously in determining what kind of services and how extensive they need to be that would comprise a reasonable offer, the offer you're obligated to make within some limits. Does it leave your discretion wide open or does it funnel you in a certain way? Your Honor, it does not funnel the plan in this respect to a preordained outcome for a particular potential enrollee and the number of personal care hours that he or she may require. In fact, the assessment can only be done by a registered nurse and as my colleague recited earlier, it's not, yes, the state directs the plans to consider a host of factors, but it doesn't direct them to a certain outcome in applying those factors. Actually, it requires them to deploy a registered nurse along with the physician and other professionals as needed to really assess the totality of the potential enrollees' needs and starting with the functional status and I'm going to interrupt again, but given the importance of understanding how broad a range of discretion your client has in making the initial, pardon me, can you hear me? Mr. McGovern? Yes, you're cut out for a moment. Could you just repeat your question, please? Thank you. Let me try again. Given the importance of understanding the scope of your client's discretion in analyzing the plaintiff's due process issue, I wonder how we can understand from the motion to dismiss stage, given the inferences we're supposed to draw in plaintiff's whether your client's discretion is meaningfully channeled without understanding exactly how the system works because that helps shape the understanding of the due process claim and at the rights at issue, I think. Could you address that question for me, please? Yes, Your Honor, and I believe that there are, in fact, no issues, factual issues in dispute about that the assessment process. I don't think that I think all sides agree that the plan is supposed to apply the uniform assessment tool and all parties agree that the MLTC policy guidance has framed how the plans are supposed to assess the members. So, I don't think there is any factual dispute that needs to be developed. I think if any, it's simply from our perspective, the appellee is characterizing the undisputed fact that the plan is required to assess the functional status and capacity, the cognitive impairment of a potential enrollee, the home environment. They actually have to go into the home and see, are there any impediments to the potential employee's activities of daily living, like a staircase or the contours of the apartment or home, that all of those factors involve judgments that cannot be characterized as limiting the discretion to the point that a specific outcome would be mandated. All of those factors are undisputed. The process for performing the variable factors and necessary judgment required to determine the medically necessary number of hours, the differences from an appellant's perspective, that is simply a rote application that any layperson can do. To the contrary, the undisputed record shows that it is an RN who has to perform that and has to exercise professional judgment on the perspective and enrollees. They have to do this every time someone applies. They have to perform that and find out if there is family there to provide support. They have to learn about the home environment and find out if there is any cognitive impairment that might aggravate the ability to perform the activities of daily living. Those factors are set. I'm sorry. You make that evaluation the same for enrolled clients as well as applicants, is that right? Yes. The applicant is assessed and a plan of care is developed and a proposed number of hours are offered to the applicant. Similarly, every six months, the plan must perform another assessment with the same rigor and professional judgment that is performed at the time that the applicant seeks or solicits an offer for personal care hours. We will have to end here, counsel. We will have to end this. You have long since expired your time. I know you have had a lot of questions. Thank you very much. I will turn to Mr. Bellin for three minutes in rebuttal. Thank you, Your Honors. The first thing I want to point out is, as this Court is well aware, we are up here on a motion to dismiss. There have been a lot of allegations about competition and how evaluations work and so on and so forth. None of those things are in the complaint. We don't have the UAS assessment system. We haven't been able to discover that. The thing that has struck in my mind from all this argument is that Ms. Bellin didn't have a property right in anything when she was a pre-enrollee. What basis did she have? Well, again, Your Honor, as we pointed out, pre-enrollees, this Court has held that if the discretion is meaningfully channeled, we need to have the discovery to show that actually in practice it is meaningfully channeled. That is how ALJs in these hearings reverse determinations made by MLTCs. There are standards that are set for determining how many hours somebody needs. This is not a complicated determination. That is how ALJs are able to make the decisions. If it was totally subjective, there would be no standards whatsoever. The Supreme Court has made clear that the fact that there is one of the assessments, how willing the daughter who lives next door is to help her mother with her needs during the day. Well, I don't really think so, Your Honor, but even if it were, that's a simple question. The other resources that she has available to their SBA assessment, this isn't simple math. This is not one plus one plus one. This is an assessment of how someone lives and what their needs are on a daily basis. It's not deciding whether someone has a broken leg or someone has a displaced vertebrae. This is about how much time an elderly person needs, what their cognitive functions are, whether they can run the vacuum cleaner, things like that. Isn't that what this assessment is? That doesn't work. In my own family, when a parent was ill, I was able to determine how many hours she needed in terms of care. But let me move on to one other thing. They're completely ignoring that under federal law, Medicaid... You're breaking up. I can't hear you. I'm sorry, Your Honor. Medicaid beneficiaries are entitled to retroactive benefits. According to them, because the retroactive benefits, the determination they make as to the number of hours can never be appealed, that initial determination. You're never able to show that retroactively you were entitled to 24 hours and that you should get reimbursed or you're entitled for that care. They say that that determination is never appealable. That can't be correct. It's completely inconsistent with the idea that you can get retroactive benefits and the case is not moot because nobody could possibly have enough time to bring a lawsuit under these regulations and statutes. And there's no change in the appellant's condition. In fact, the second fair hearing decision, whose factual findings are binding on this court, specifically found that there was no change between the two. So that's sort of a red herring, that doesn't affect this. In sum, this case is not moot. There is a statutory and regulatory right to appeal both under the new regulations and statute and the old regulations and statute, which were not explicitly or implicitly repealed. And therefore, Your Honor, we believe that the district court's determination should be reversed and we should be sent back down for more discovery and not rely on facts that are just alleged by them on argument. Thank you very much. Thank you. Thank you both. Thank you, all three of you. Interesting case. Very interesting. We will reserve decision.